## New Eastwick Corp. v. Philadelphia Builders Eastwick Corp.

*Theodore Voorhees*, for plaintiff.

*John R. McConnell*, for defendant.

REIMEL, P. J., July 18, 1966.—This is an action in equity seeking a decree restraining defendant from executing a redevelopment contract with the Redevelopment Authority of Philadelphia. The controversy

arises out of the redevelopment of the Eastwick section of Philadelphia. The matter came on for hearing before our late President Judge Alessandroni. The parties have stipulated that the matter be determined by Reimel, P. J. After consideration of the pleadings and the testimony adduced at the hearing, the substituted chancellor makes the following:

## FINDINGS OF FACT

1. Plaintiff is a Pennsylvania corporation organized for the purpose of engaging in the redevelopment of Eastwick. Its stock is owned 56 percent by the Reynolds Metal Company and 44 percent by Samuel A. and Henry A. Berger.

2. Defendant is a corporation organized by a group of nine home builders in Philadelphia for the purpose of bidding on the redevelopment of Eastwick.

3. The Redevelopment Authority of the City of Philadelphia is a public corporation, chartered under the laws of Pennsylvania, whose function is to eliminate blight areas of the City of Philadelphia and to sell the land to users who will redevelop it in accordance with plans approved by the city planning commission.

4. The Eastwick redevelopment project is divided into four stages of residential construction, each involving approximately 2,500 units; the plans also provided for three stages of industrial construction; some commercial development was to be located in the residential areas.

5. Plaintiff and defendant bid against each other for the right to redevelop the four residential stages of Eastwick, and on May 27, 1960, the authority adopted a resolution awarding all four stages to plaintiff.

6. The authority agreed to convey a good and marketable title to the "Project Area" subject to the terms of the agreement for a sum in excess of $12,000,000.

7. Thereafter, on February 15, 1961, after prolonged negotiation, an arrangement was negotiated by the

development coordinator whereby defendant was to be given the opportunity to acquire a portion of residential stage III and all of stage IV, together with the right to construct the regional shopping center in stage II.

8. By ordinance dated July 11, 1961, city council approved the award of stages I, II, III and IV to plaintiff as the nominee of Reynolds Metals Company and the Berger brothers, and on July 12, 1961, plaintiff entered into a redevelopment agreement with the authority under the terms of which it, as "Redeveloper", was awarded the right to acquire by purchase all the land in all four residential stages, but subject to the terms of an option agreement in favor of defendant, as set forth in paragraph 2 of said agreement.

9. Paragraph 2b of said redevelopment agreement provided as follows:

"REDEVELOPER agrees that Stages III and IV of the Project Area shall, subject to the provisions of sub-paragraph g of this paragraph 2, be conveyed by the AUTHORITY to PHILADELPHIA BUILDERS EASTWICK CORP., or its nominee, subsidiary or affiliated corporation pursuant to a separate Redevelopment Contract between the AUTHORITY and PHILADELPHIA BUILDERS EASTWICK CORP.; provided, however, that the AUTHORITY agrees to convey to REDEVELOPER sufficent land in Stage III, (contiguous to Stage I and II), to permit the construction of 650 dwelling units in accordance with the Urban Renewal Plan".

10. Paragraph 2c of said redevelopment agreement provided as follows:

"REDEVELOPER agrees that the portion of the Project Area proposed for a major shopping center in Stage II, described in the Urban Renewal Plan, shall, subject to the provisions of sub-paragraph g of this paragraph 2, be conveyed by the AUTHORITY to

PHILADELPHIA BUILDERS EASTWICK CORP., or its nominee".

11. Paragraph 2f of said redevelopment agreement provided as follows:

"Notwithstanding the provisions of Paragraph 7 of this Agreement, in the event that PHILADELPHIA BUILDERS EASTWICK CORP. shall have entered into a Redevelopment Contract with the AUTHORITY, with respect to the redevelopment of the Stages or portions of Stages referred to in sub-paragraphs b and c of this Paragraph 2 and shall have filed with the AUTHORITY security in the amount of $150,000.00 then, at that time and in such event, REDEVELOPER shall have its security obligation reduced to $100,000.00 and shall be relieved of its obligation to perform the development of, or to pay the consideration for, those Stages or portions of Stages, allocated to PHILADELPHIA BUILDERS EASTWICK CORP.; nor shall REDEVELOPER have any responsibility for the performance of the Redevelopment Contract between the AUTHORITY and PHILADELPHIA BUILDERS EASTWICK CORP".

12. Paragraph 2g of said redevelopment agreement provided as follows:

"In the event that the AUTHORITY and PHILADELPHIA BUILDERS EASTWICK CORP. shall not have entered into a Redevelopment Contract and in the event that security in the amount of $150,000.00 shall not have been filed in connection therewith, within thirty (30) months from the date of approval of REDEVELOPER by City Council of the City of Philadelphia, then, in such event the provisions of sub-paragraphs b, c, d, and f of this Paragraph 2 shall become null and void".

13. The 30-month period contemplated in section 2 (g) of the redevelopment agreement expired on January 12, 1964.

14. On September 3, 1963, defendant wrote to the authority requesting consideration of a modification of the redevelopment agreement to the end that the expiration date of defendant's option would be extended beyond January 12, 1964.

15. Paragraph 2(d) of the agreement specified that the stages were to be developed consecutively, so that stages III and IV would not be ready for construction until stages I and II were substantially completed.

16. In September 1963, it had become apparent that stages I and II were almost hopelessly behind schedule, insofar as the preparation of stages III and IV as previously contemplated were concerned.

17. The reason for the delay was beyond the capacity of the parties to alter.

18. Late in November 1963, an exploratory discussion took place between representatives of plaintiff, defendant and the authority, at which plaintiff's general manager, O. A. Thomas, suggested the modification of certain provisions in the redevelopment agreement of July 12, 1961, which would relieve defendant of the necessity of executing a redevelopment agreement for stages III and IV by January 12, 1964, provided certain additional modifications of the agreement of July 12, 1961, which plaintiff desired, would likewise be made.

19. It was agreed at the November meeting that Thomas would consult his superiors and would put his proposals in writing; another meeting was held on December 3, 1963, and Thomas addressed a letter dated December 19, 1963, to Mr. F. J. Lammer, the executive director of the authority, recapitulating his recollection of the meeting of December 3, 1963.

20. Defendant took no action with reference to the exercise of the option prior to its expiration date, January 12, 1964, other than to write to Mr. Lammer under date of January 10, 1964, requesting that the

date of January 12, 1964, "be set-off until the unresolved matters be cleared away". (The notes of testimony erroneously give March 10, 1964, as the date of the letter.)

21. Thereafter, there was no direct communication by letter or otherwise between plaintiff and defendant, relating to an extension of the option or to a new agreement; heretofore, all communication was through the authority.

22. An effort was made by the authority to obtain agreement between plaintiff and defendant, but no agreement was ever reached.

23. On June 26, 1964, without notice to plaintiff, defendant delivered to the authority a preliminary agreement for the redevelopment of a portion of stages II and III and all of stage IV, together with a letter from Provident Tradesmens Bank and Trust Company signifying a willingness to enter the required security, as set forth in paragragh 2(f) of the agreement.

24. On or about July 15, 1964, plaintiff notified the authority that it would insist on the date of January 12, 1964, as that for the expiration of the option agreement.

25. A meeting was held on or about August 3, 1964, at which time Albert Cole, president of plaintiff, indicated that January 12, 1964, was binding, but that he was willing to discuss the matter.

26. On or about October 12, 1964, without notice to plaintiff, defendant executed and delivered to the authority a new and undated preliminary agreement for the redevelopment of a portion of stages II and III and all of stage IV, under the terms of which defendant obligated itself to enter into a redevelopment contract for said stages prior to January 12, 1967.

27. Defendant was not required to give plaintiff notice.

28. On January 5, 1965, the authority requested defendant to provide security of $150,000, in accordance with the terms of its proposed preliminary agreement, and thereafter, on January 15, 1965, such security was delivered by defendant to the authority.

29. Defendant requested that the authority execute the preliminary agreement, and the authority has indicated its willingness and intention to execute same unless restrained from doing so by this court.

30. Defendant could not possibly execute a redevelopment contract because it could not possibly meet the legal requirements of same, inasmuch as the plans and specifications required were not yet prepared.

31. While the negotiations were pending in the fall of 1963, Thomas, in his letter of December 19, 1963, suggested the execution of a preliminary agreement; this was a variation of the contract between plaintiff and the authority.

32. In his letter to the authority dated December 19, 1963, Thomas recapitulated his understanding of a meeting held December 3, 1963, with reference to the execution of a preliminary agreement by defendant on or before January 12, 1964.

33. At the meeting of December 3, 1963, Thomas did not make it clear that plaintiff was going to insist on the January 12, 1964 deadline for defendant to exercise the option.

34. In the letter of December 19, 1963, Thomas suggested that defendant be required to sign the agreement for residential stages III and IV six months after plaintiff had 1,500 dwelling units under construction, in return for certain concessions by the authority.

35. This letter was not sent to defendant by either plaintiff or the authority.

36. On January 10, 1964, defendant's president wrote to the authority asking that the January 12,

1964, date be set off until the unresolved matters were cleared away.

37. The major cause for delay in this entire development was the difficulty in selling property in an integrated area.

38. Stages III and IV could not begin until the completion of stages I and II, as this was to be a progressive development.

39. Thomas was in the hospital most of March 1964, and did not return to his office until late in April.

40. In July 1964, plaintiff notified the authority that it was going to insist on January 12, 1964, as the deadline for the option agreement, after which defendant's rights were terminated.

41. On August 7, 1964, a meeting was held, at which Albert Cole, president of plaintiff, indicated that he believed that the time had expired to exercise the option, but that he was willing to discuss the matter toward a mutually satisfactory arrangement.

42. No such agreement was ever consummated.

43. We make no specific acceptance or rejection of the requests for findings of fact by both plaintiff and defendant, but have set forth what are, for all practical purposes, the undisputed facts; where the requests contain conclusions, they are rejected.

## DISCUSSION

Plaintiff's position in this matter is that, since the time for the exercise of the option by defendant had expired, any efforts by defendant to execute an agreement with the authority thereafter was tortious interference with its contractual rights.

We must start with the basic proposition that, upon the execution of the redevelopment contract between the authority and plaintiff, equitable title to the land rested in plaintiff. The authority continued to hold legal title as security for the purchase price, in this instance a sum in excess of $12,000,000: Payne v.

Clark, 409 Pa. 557 (1963); Allardice v. McCain, 375 Pa. 528 (1953).

However, this contract, in its terms, provided for an option to be exercised by a third party not signatory to the contract. Defendant corporation was obviously involved, since in a memorandum dated February 15, 1961, it was agreed that the Eastwick redevelopment area was to be divided between plaintiff and defendant. We are not impressed by the proposition that it was not a formal writing; nor that it was unsigned. Manifestly, this was the case because its provisions were incorporated in the redevelopment contract, which, when later executed, set forth defendant's option as per this agreement of February 1961.

We turn now to the developments in the latter part of 1963. It had become most apparent that the open occupancy feature of this development made it impossible to build and sell the number of units contemplated in the early part of 1961. Plaintiff has 10 years from July 1961 to complete the project, which envisions approximately 10,000 dwellings, three industrial areas and some commercial construction.

The entire program, at late 1963, was practically stymied at this point. In January 1964, 30 months after approval by city council, only 261 units had been constructed and sold. Plaintiff was far behind schedule. This fact is not an excuse, however, which should redound to defendant's benefit. It does, however, have some bearing on the question of harm, irreparable or otherwise.

In September 1963, the question of the execution of an agreement on or before January 12, 1964, was raised by defendant. Several meetings were held, at which various propositions were made. In December 1963, the last meeting was held, and thereafter, a letter dated December 19, 1963, was sent to the authority by Thomas. In this letter, Thomas made cer-

tain proposals, one of which was that it would be mandatory for defendant to sign the required contract and post security six months after plaintiff had completed 1,500 units. This letter stated that defendant should execute a preliminary agreement by January 12, 1964.

The letter of December 19, 1963, was sent, according to Thomas, because he felt that he had not made his position clear as to the expiration of the option agreement. Quaere: Why did he wait 16 days before writing his version of the meeting of December 3, 1963? Others at the meeting testified that the preliminary agreement was to be signed by defendant and security posted immediately, i.e., at the conclusion of the negotiations.

Thomas nowhere in his testimony states categorically that plaintiff was going to insist on performance by defendant, as required, on or before January 12, 1964. We think this case is suprisingly like the case of Cohn v. Weiss, 356 Pa. 78 (1947). In that case, an agreement of sale provided for settlement on or before November 25th. This was later extended to December 26th; thereafter, buyer advised seller that the earliest date available at the title company was December 29th. The vendor told the buyer he would let him know. On December 29th, when buyer appeared for settlement, he was advised that the agreement expired December 26th, and that, therefore, the deposit was forfeit.

The court held that, even though the agreement stated that time was of the essence, the conduct of the parties constituted a waiver by the seller of his right to insist thereon.

So, in this case, plaintiff never stated to defendant that it must act before January 12, 1964, or any rights under the option agreement were forfeit. Had plaintiff done this seasonably, there would be no problem. However, by the fact that plaintiff did not make

such a demand, and negotiations as to revision and extension were not concluded prior to the deadline, plaintiff has apparently waived its right to insist on strict performance.

We do not base this conclusion on a theory of equitable estoppel, as set forth in Watt Estate, 409 Pa. 44 (1962); it is a waiver, pure and simple. There can be no doubt that negotiations were in progress. The problem which arises was obviously not one within the contemplation of the parties back in the spring of 1961. When the situation crystallized as it did, all were aware that, because of the progressive stage development, it would be some time before defendant could even begin. Thus, the negotiations were instituted.

The latest theory advanced by defendant that plaintiff has breached some other contract provision with the authority, and that this somehow offsets defendant's admitted failure to perform, is somewhat less than impressive and merits no further consideration.

The main thrust of plaintiff's complaint, i.e., tortious interference with a contractual relationship, needs no further consideration, because if plaintiff has, as we have concluded, waived its right to strict performance, then there can be no tortious interference.

Plaintiff has sustained a loss in that it has to bear the burden of an excessive bond premium; we feel that this is the only harm plaintiff has sustained and that it ought to be compensated for the excess over the premium on a $100,000 bond. Defendant will be ordered to reimburse plaintiff.

### CONCLUSIONS OF LAW

1. The court has jurisdiction of the parties and subject matter.

2. Plaintiff has failed to make out a case of tortious interference with its contractual rights.

3. Plaintiff, by its conduct, waived the right to demand strict performance.

4. Plaintiff has failed to make out a case of irreparable harm.

5. Plaintiff has made out a case for reimbursement by defendant of the bond premiums from January 12, 1964, in excess of that to be paid on a $100,000 bond.

6. The complaint should be dismissed.

## ORDER

And now, to wit, July 18, 1966, upon consideration of the pleadings, testimony and argument thereon, the chancellor enters the following:

## DECREE NISI

And now, it is ordered, adjudged and decreed that the complaint should be and is hereby dismissed, provided, however, that defendant is ordered to reimburse plaintiff for the bond premium in excess of that required for a $100,000 bond from January 12, 1964.

The prothonotary is directed to give notice to the parties of the filing of this decree, and unless exceptions are filed thereto within 20 days hereof, this decree shall become a final decree.